# Stephens v. Commonwealth.

Oct. 26, 1943.

Lilburn Phelps, Ralph Hurt and J. C. Carter, Jr., for appellant.

Hubert Meredith, Attorney General, and Arthur T. Iler, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

On a Saturday night in July, 1942, Elmer Stephens, the appellant, shot and killed Sam Long at a roadhouse or club denominated the "Club Alamo," operated by appellant about five miles from Jamestown, Kentucky. At the September term of the Russell circuit court the grand

jury returned an indictment against appellant charging him with the willful murder of Long and upon a trial of the case he was found guilty of manslaughter and sentenced to two years in the state reformatory. A reversal of the judgment is asked upon three grounds, namely, (1) the court erred in rejecting competent evidence offered by appellant; (2) the court failed to instruct the jury on the whole law of the case, and (3) newly discovered evidence.

It appears that appellant's place of business, the Club Alamo, was not open to the public generally but the patrons of the place were restricted to those who held membership cards. On the night of the homicide the deceased and a number of companions, Arnold Holder, Quinton Lloyd, and two or three others, all traveling in the same automobile, arrived at appellant's place of business and parked their car in a parking space near the front of the building. There were two entrances to the building, one a double door in front and the other a single door in the rear of the building. Holder left the car and went to the rear door of the building and asked for beer and appellant informed him that he had no beer and Holder then asked for a bottle of "7-Up" which was delivered to him by appellant handing it to him on the back porch through the door. Holder disappeared and he, the deceased, and the other companions who remained in the car, drove about three-quarters of a mile down the road and then returned to appellant's place of business and Holder, the deceased and Quinton Lloyd appeared at the same back door of the building and Holder called for another bottle of 7-Up which appellant delivered to him by unhooking the screen door and reaching it through the door to him and receiving the money therefor. Before appellant closed the screen door or while in the act of closing it, the deceased suddenly appeared in the door attempting to enter the room and appellant told him not to come in but he proceeded through the door into the room a short distance and appellant then fired the shot resulting in his death.

The sufficiency of the evidence to sustain the verdict is not questioned but for the purpose of determining the question raised concerning the instructions, a review of the evidence becomes necessary. According to the evidence of the witnesses for the Commonwealth, when the deceased entered the door and at the time he was shot

his hands were down at his side and he was not assaulting or attempting to assault appellant in any manner, but it is shown by the preponderance of the evidence that when deceased approached or entered the door appellant forbade him to come in, telling him two or three times that he could not come in, but deceased proceeded to the inside of the room. Appellant testified that when Holder appeared at the rear door the second time and called for a bottle of 7-Up he delivered it to him and at that time he saw Quinton Lloyd standing behind Holder; that when he started to close the door Holder jerked the door and the deceased then suddenly appeared for the first time, and seeing them all there together he did not know what to do; that he looked again toward Lloyd and saw that he had a pistol in his hand; that he told the deceased two or three times not to come in but the deceased proceeded through the door with his right hand behind him and said: "Oh, God Dam" and shoved him with his left hand and he then fired the shot. He said: "I knew he was going to kill me. I kept telling him to not come in. I had to shoot." After the deceased was shot some of his companions on the outside fired several shots through the door or windows into the room and appellant fired several shots from the inside toward his assailants. Appellant turned off the lights and told his customers to lie on the floor, which they did until after the shooting ceased. Appellant took refuge in the upstairs bedrooms of the house and his wife called the officers. While he was hiding, Holder came back in the house and called him but he said he was afraid to go downstairs.

There was also considerable evidence to the effect that the deceased's reputation for violence was bad and that he was considered in the community as being a dangerous man. Also, sometime previous to the homicide deceased had told some one that appellant would not allow him in his place of business and said, in substance, that he was thinking of going down there and "wrecking the joint." This information was imparted to appellant sometime previous to the homicide. The evidence, viewed in the light of attendant circumstances, indicate that the deceased, Holder and Lloyd might have conspired together for the purpose of entering appellant's place of business and committing violence to appellant or his guests or property, and that their purpose in appearing at the rear door of his place of business to purchase a bottle of 7-Up was a ruse or plan devised for the pur--

pose of gaining entrance. It appears that appellant had previously given Holder a membership card entitling him to attend the club, but sometime previous to the time of the homicide in question appellant told Holder that he did not desire his attendance or presence at his place of business and that his membership card was no longer in effect.

The vice urged to the instructions given the jury is that the court gave the jury the usual self-defense instruction but did not, as requested by appellant, instruct the jury with respect to appellant's right to prevent the deceased and his companions from entering the building, or to prevent them from committing trespass on his property, or a breach of the peace or a disturbance on his premises. It is insisted for the Commonwealth that appellant was not entitled to such instruction because it was shown by the evidence that the part of the building deceased and his componions were attempting to enter or did enter was not appellant's residence or home, but a public place of business. Appellant testified that he had removed or set back a partition wall on the first floor of the building in order to make room for his place of entertainment but that his kitchen was on the first floor of the building and that he and his wife also used the first floor as their living room and occupied two bedrooms upstairs at night. Be this as it may, however, appellant had the right to protect his premises, whether it was his habitation as a home, or a place of business.

In Adams v. Commonwealth, 292 Ky. 786, 168 S. W. (2d) 40, 41, where a similar or like question was involved, it is said: "The final contention is that an instruction should have been given embodying appellant's right, as the keeper of a house of public entertainment, to eject the deceased from the premises if he was creating a disturbance and to use such force as was reasonably necessary to that end. Undoubtedly, the failure to give an instruction of this type is error where a killing occurs while a proprietor is attempting to eject one who engages in a fight or creates a breach of peace or disturbance on his premises. Gargotto v. Isenberg, 244 Ky. 493, 51 S. W. (2d) 443. But in the case before us, just as in the cited case, appellant did not claim that he was attempting to eject the deceased from his premises when the difficulty between him and the deceased began. His testimony was merely that the deceased attacked him when he told him to put up his knife and not have any trouble. The usual

self-defense instruction, which was given, was sufficient in the circumstances properly to present appellant's defense to the jury. One who commits a killing in his own home or in his business establishment is not in every case entitled to an instruction on defense of the habitation or the right to eject from the premises, as the case may be, but such an instruction is proper only when the evidence authorizes it. Rhodes v. Com., 278 Ky. 504, 128 S. W. (2d) 948; Hatfield v. Com., 264 Ky. 721, 95 S. W. (2d) 562. Since the evidence did not show an attempted ejection of the deceased from the premises by appellant, the self-defense instruction was sufficient.''

To the same effect is the Gargotto case, cited in the above quotation, and Stacey et al. v. Commonwealth, 189 Ky. 402, 225 S. W. 37, 25 A. L. R. 490; 30 C. J., page 85, Section 266. In the above cases it appears that there was no attempt to eject the assailant or trespasser from the premises but the defendant relied solely on defense of his person. In the present case it is shown by practically all the evidence that appellant requested and ordered the deceased not to enter his place of business, which was the equivalent or the same as an attempted ejectment after he had entered the premises. In the circumstances we think that appellant was entitled to an instruction with respect to his right to eject or prevent the deceased and others acting in concert with him, if they were so acting, from entering his premises, as well as an instruction on the defense of his person. As was pointed out in the Gargotto case, supra, such an instruction is proper for the purpose of explaining the right of defendant to protect his premises, or to expel an intruder to the end that the jury may not be misled into believing that the defendant was the aggressor, and for that reason deprived of the right of self-defense. We think this instruction and the self-defense instruction as given by the court should have been embodied in one instruction, in substance as follows: The court further instructs the jury that the defendant, Stephens, had the right to prevent the deceased, Long, and others with him, from forcibly entering or remaining in defendant's premises and to use such force as was reasonably necessary so to do short of inflicting on them great bodily harm; and, if in so doing, the defendant believed and had reasonable grounds to believe that he was in danger of death or great bodily harm at the hands of the deceased or others with him, then he had the right to use such force as he be-

lieved and had reasonable grounds to believe was necessary to protect him or his guests from such impending danger even to the taking of the life of the deceased, and if you shall believe from the evidence the defendant shot and killed the deceased under these circumstances and that such shooting was believed by the defendant to be necessary to avert such danger, real or to him apparent, you will find the defendant not guilty.

We now come to consideration of the alleged competent evidence offered by appellant and rejected by the court. O. L. Hughes, jailer of Russell county, was introduced as a witness for appellant and asked whether the witness Holder was drunk or sober when he saw him at appellant's place of business on that night, which was about three hours after the homicide. The court sustained objections to the question, whereupon counsel avowed that if permitted to answer the witness would state that Holder was drunk when he saw him at appellant's place of business after the slaying. Apparently the court rejected the evidence upon the theory that too long a time had elapsed after the homicide and that even though Holder was drunk at the time Hughes saw him he had had ample time to have gotten drunk after the homicide was committed. However, there is some evidence to the effect that Holder was drinking or had been drinking on that night previous to and at the time of the trouble. Since the case must be reversed because of the error in the instructions as indicated above, we express no opinion as to whether or not the rejection of this evidence was reversible error. But in the circumstances we think that upon another trial of the case, if one be had, if there is evidence that Holder was drunk or intoxicated at the time of the homicide, appellant should be permitted to show by evidence whether or not he was in a drunken or intoxicated condition at the time the witness Hughes saw him at appellant's home after the homicide. It is not shown that Holder left the premises of appellant after the homicide, but apparently remained there from that time until the witness Hughes arrived, and if he was then drunk or intoxicated, it might be sufficient to warrant the inference in the minds of the jury that he was drunk before and at the time of the homicide rather than becoming in that condition after his companion had been slain. We think appellant should be given the benefit of the doubt; that is, whatever the evidence might be worth, if anything. Other evidence offered by appellant and re-

jected by the court is that appellant attempted to prove by Ben Sharp that a little more than a month after the homicide Quinton Lloyd was rejected by the local draft board because he was suffering from recent gun shot wounds. We are unable to see what connection or bearing this has on the issues of the case, except we infer from the statements contained in appellant's brief that such evidence would reasonably warrant the inference that Lloyd received his gun shot wounds at the hands of appellant in the shooting melee at the time of the homicide and instituted no prosecution against appellant nor made any complaint in reference thereto because he, Lloyd, himself was firing into appellant's house when he received the wounds. We think such conjecture or speculation is too far-fetched to amount to evidence, and hence the court did not err in rejecting it. These conclusions make it unnecessary to discuss or pass upon the question of whether or not the court should have granted appellant a new trial on the ground of newly discovered evidence.

Because of the error of the court in failing to instruct the jury as we have indicated above, the judgment is reversed and remanded for proceedings consistent with this opinion.