THE STATE OF WYOMING,

*Plaintiff and Respondent,*

v.

LOUIS VELSIR,

*Defendant and Appellant.*

(No. 2305; May 15th, 1945; 159 Pac. 2d. 371)

For the Plaintiff and Respondent there was a brief by Louis J. O'Marr, Attorney General, and L. C. Sampson, Assistant Attorney General, both of Cheyenne, Wyoming, and oral argument by Mr. Sampson.

478

For the Defendant and Appellant there was a brief and also oral argument by W. A. Muir and Glen G. Stanton, both of Rock Springs, Wyoming.

## OPINION

CHRISTMAS, District Judge.

The defendant in this case was charged with the crime of murder in the first degree for killing one Earl Cox on November 22, 1943. The jury found the defendant guilty of manslaughter, and from a judgment entered in accordance with that finding, the defendant appeals.

Briefly, the pertinent facts are that in the evening of November 22, 1943, appellant and one Claude Whitfield met at the Belmont Bar in Rock Springs, Wyoming, and shortly thereafter left and went to the room of the deceased in the Park Hotel. Apparently Cox and Velsir had never met. After a brief conversation and the serving of some drinks of whiskey, Cox suggested a game of dice, commonly known as "craps." Cox, Velsir and Whitfield participated in the game until both Velsir and Whitfield lost their money. During the game two men entered the room, but did not take part in the game. The defendant, accompanied by Whitfield and at least one of the men, left the room for the expressed purpose of obtaining more money. This accomplished, they all returned to Cox's room and Cox and Velsir resumed the dice game. Velsir continued to lose his money and becoming suspicious picked up the dice from the floor, made a remark to the effect that "these are crooked dice," and according to the wit-

ness Whitfield, Cox and Velsir "started sort of quarreling." Velsir then stepped out of the room into an adjacent hallway, followed by Cox who demanded the return of the dice. The parties continued along the hallway a short distance to some steps or a stairway. As to what then occurred there is no evidence other than that of the defendant, who testified as follows:

A. After I left Room 225 I run down the hall and I got to about, I think, where them little steps are, and I heard somebody running behind me, and pretty soon they reached and grabbed me. Q. Just show on this little map behind you where you were. This little space in about the middle here, that is the room that you were in. A. Yes, sir. I was standing right about here (indicating), and I come out and I got up to about here (indicating), and I heard a man behind me, and just when I got about here, I suppose (indicating), he grabbed me, and he said, "I'll stomp your God damned head in the floor if you don't give me them dice." Q. Did he say anything about the law? No, not then, but when he grabbed me I turned around and I looked down, and he had this big knife down in his right hand, and he said, "It ain't going to do you no good to take them dice to the law." Q. Had you told him that you were going to take the dice to the law? A. No, sir, I didn't tell him nothing. I told him to go on and leave me alone, and then I was backing up down the hall, and I don't know how many steps I took backward, and he was cussing me all the time, and he said, "I'll cut your God damned head off," he said to me, and just then he reached out and struck me with his knife, and I was backing away from him, and I jumped back, because I was scared, and I pulled my knife out, and the next time his arm went by I cut across this way (illustrating) with my knife, and he hollered something about to get him a doctor, and I turned right directly around to my right and I went to the elevator,

and when I got up there I saw over here on this side was some stairs, and I went down those stairs and down into the lobby, and I looked in the lobby but there was nobody there, so I walked into the bar-room— Q. Now, just a minute, take it a little slower. You get talking so fast that we don't know what you are talking about. Just a minute before you go on with that. From where you last stopped there, where you were backing up, could you see those steps going down? A. No, sir, I didn't know where them steps was until after it was all over. Q. You had come up on the elevator, had you? A. Yes, sir, I come up twice on the elevator. Q. And you paid no attention to the steps? A. No, sir. Q. Could you see the steps going upstairs when you came out of the elevator? A. You could see some steps going up this way. Q. You could see the steps going up? A. Yes, sir. Q. All right. What did you do after you say that you cut across his arm with the knife? A. He said, "Get me a doctor." and I turned right directly around and I went right straight downstairs. Q. Did you know at that time that you had cut him? A. No, I didn't know where I had cut him. I realized that I had probably cut him, but I didn't know where, but I had just cut across like that (illustrating), right in front of me and when he hollered, I just took from that that I had cut him, and then, when I got downstairs I saw a little blood on my tie, and I went and told Mr. Davis what had happened, and Mr. Davis had a screw-driver, fixing something, and he said, "I'm busy," and I had them dice in my pocket, and I pulled them out and had them in my hand, and I told him, I said, "There is a man upstairs that I was shooting dice with, and some other people was in the room during the dice game," and I said, "I caught him with these crooked dice," and he said, "I'm busy right now," and I said, "You had better not be too busy, because me and him had a little cutting up in the hall there and he

wants a doctor," and then he said something more and I went right on out. He said something, I think, about calling the police, or something, and I turned around and went right out of there, and went down through the underpass, down Front Street, and down Front Street on my left, because I live on the left-hand side of the street, and I went to Mr. Williams' place. Q. That is, Larry Williams, the colored man who testified here? A. Yes sir. I asked Mr. Williams if he would put them dice away until I come for them later, and I would turn them over to the law, and he said he would.

Cox was later taken to the Wyoming General Hospital where at about 11:15 o'clock the same evening he was attended by Dr. K. E. Krueger who testified that "There was a superficial cut about five inches long on the left breast, just through the skin, was all, but not into the subcutaneous tissue." Also: Q. How large was the cut on the right wrist? A. Oh, it was a V-shape, approximately two inches on each side of the V. Q. I will ask you to state if that cut any vein or arteries? A. It cut a vein, one of the main veins to the hand, but no artery. It cut into the subcutaneous tissue and a portion of one of the tendons. Q. As compared to the other veins in the wrist, how does that compare? A. It is one of the largest. It is about the size of the largest vein in the wrist.

Earl Cox died on the 26th day of November, 1943, at 2:30 o'clock in the afternoon.

On November 28, 1943, an autopsy was performed on the body of the deceased by Dr. John H. Carlquist, a pathologist, of Salt Lake City, Utah, assisted by or in the presence of Dr. K. E. Kreuger and Dr. E. S. Lauzer, of Rock Springs, Wyoming. We shall have occasion to refer to their testimony later.

1. Counsel for defendant complain of the refusal of the Court to permit him to show the general reputation of the deceased by the witness Mary Martin. This witness was asked about her relations with the deceased and she replied: "I was known as his girl, but it wasn't under the usual circumstances that is spoken of." Q. You were known as his girl? A. Yes. The only inference that can be drawn from this testimony is that defendant attempted to prove decedent's general bad conduct or immorality. Such being the case the ruling of the Court was correct. 30 C. J. 174, states the rule as follows:

"The inquiry as to the character of deceased must relate solely to his general character for violence, ferocity, vindictiveness, or bloodthirstiness. Thus, it is not admissible to prove decedent's general bad conduct or immorality."

See also Underhill's Criminal Evidence, Fourth Edition P. 1116.

Upon trial of homicide, evidence is not admissible of the bad moral character of deceased. Stacey v. Com., 189 Ky. 402, 225 S.W. 37, 25 A.L.R. 490, and cases collected in 64 A.L.R. 1029 et seq.

The defendant offered to prove that the deceased "pulled a knife on a girl in the White Front rooms in October, 1943, for the purpose of showing that he was the probable aggressor in this case, and to show his reputation as a knife man and for carrying a knife."

To this offer the prosecuting attorney stated: "If he is going to prove that by specific acts, it is inadmissible. The only thing he can do is to show his general reputation, and that is the only thing that is admissible." The Court remarked: "Objection sustained as to specific act."

The ruling of the Court is assigned as error.

It may be noted that the offer was very limited in its scope—no details were offered to be proved, nor were any circumstances offered to be shown so as to inform the trial Court of the conditions surrounding the claim that the deceased "pulled a knife on a girl in the White Front rooms in October, 1943."

This Court held in Mortimore v. State, 24 Wyo. 452, 474, 161 Pac. 766, a case wherein the defendant was charged with the crime of murder, and the defendant offered to prove specific acts of violence by the deceased known to defendant, that:

"For that purpose where there is evidence tending to show that the defendant acted in self-defense, or, as in this case, in defense of another, evidence of specific acts of violence by deceased in the presence of the defendant, or communicated to him before the homicide, is held to be admissible by many authorities, and we think upon strong and convincing grounds. It is true that the general rule permits the character of the deceased, when admissible at all, to be shown only by evidence of general reputation, and not by evidence of specific acts. Evidence of the violent and dangerous character of the deceased known to the defendant is admissible, where there is evidence tending to prove that the latter acted in self-defense, or in defense of another whom he might rightfully so act, as an aid in determining the reasonableness of the defendant's apprehension of danger at the time of the homicide."

It does not appear from the evidence, nor does the defendant purport to show by his offer, that he knew, if true, of the violent and dangerous character of the decedent or that the defendant had any knowledge of the matter.

The offer of proof was too limited in its scope.

Additionally, it may be said that at the time of the offer there had been no evidence introduced tending to prove that the defendant acted in self-defense. Mortimore v. State, supra. Also

"It is well established that in order to render admissible evidence of the character or reputation for turbulence or violence of the victim of the homicide, a proper foundation must be laid by some evidence tending to show that the defendant in committing the homicidal act acted in self-defense. * * * The necessary preliminary showing or appearance of a case of self-defense may be adduced either in the evidence given in behalf of the state in its main case or by the defendant in his defense; the only indispensable prerequisite is that it precede the offered evidence of the decedent's character."

26 Am. Jur. 391-392. See also 30 C. J. 230, and cases collected in 3 L. R. A. (N.S.) 355; and L.R.A. 1916A 1255; 2 Jones Commentaries on Evidence, Second Edition, P. 1231.

Under the circumstances as disclosed by the record in this case we find no prejudicial error in the ruling of the Court.

2. The defendant was sworn and testified as a witness in his own behalf. During his cross-examination he was asked the following question: Q. I will ask you to state whether or not you were convicted of the crime of burglary during the year 1938 in the State of Oklahoma.

To this question an objection was interposed and the defendant permitted to answer and his answer was "Yes, sir." This ruling is assigned as error.

From the comment of the trial Court, the inquiry was made with a view of affecting defendant's credibility as a witness, and in connection with this testimony gave a cautionary instruction.

The question thus presented, that is, the right of the State, on the trial of a criminal case, to question the accused on cross-examination as to his previous conviction of a felony, for the purpose of affecting his

credibility, has never been directly decided in this State.

The defendant in a criminal case was incapable at common law of testifying in his own behalf. At the present time, in most states, the accused may, as a matter of statutory right, if he so elects, testify for himself. This right is permitted in this state by Section 33-801, Revised Statutes, 1931, which provides, among other things, that the defendant in all criminal cases, in all the Courts in this state, may be sworn and examined as a witness. if he so elects.

The defendant electing to testify in his own behalf occupies a double position. As a defendant, his character cannot be attacked by the State; as a witness he puts his credibility at issue like any other witness. It is said in 28 R.C.L. 625, that it is generally recognized that one who has been convicted of crime is not entitled to the same credit as one without a criminal record, and so it is commonly allowable to prove a prior conviction of certain classes of crimes for the purpose of impeachment. The authorities are, however, not in harmony as to the class of crimes of which conviction may be proved, this being due in part to the existence of statute and in part to a difference of judicial opinion. In some jurisdictions it has been held in the absence of a specific statute on the subject that the only conviction which may be proved are convictions of offenses which at common law would have disqualified the person from testifying as a witness. And it is certainly very generally true that the conviction of a crime which at common law would have disqualified. may now be shown for the purpose of impeachment regardless of what other crimes may or may not be shown.

While some cases hold that the record of conviction is the best evidence and should be introduced, the weight of authority, however, clearly sustains the right

to show such conviction by cross-examination. 28 R. C. L. 626. In Rose v. State, 92 Tex. Crim. Rep. 560, 244 S. W. 1009, it was held that the accused in a prosecution for homicide, having taken the witness stand, was open to proper attack showing conviction for felony or other offense involving moral turpitude, he might properly have been interrogated about these while a witness.

In Hadley v. State, 25 Ariz. 23, 212 Pac. 458, the defendant was convicted of the crime of murder, and on appeal assigned as error the overruling of an objection to the question propounded to the accused by the County Attorney on cross-examination if he was convicted of murder at Muskogee, Oklahoma, on June 27, 1916, and given a life sentence, the Court said:

"The general rule, in the absence of statute regulating the matter, when a defendant offers himself as a witness, is that it may be shown, either by the record or on cross-examination, that he has suffered previous conviction of a felony or felonies. Either method is permissible." Citing Wigmore on Evidence, Vol. 2, Pp. 980; Com. V. Walsh, 196 Mass. 369; 82 N.E. 19; 124 Am. St. Rep. 559.

In State v. Black, 15 Mont. 143, 38 Pac. 674, the Court in affirming a conviction for murder, said:

"We think it certainly is competent and material to show, on cross-examniation, that a defendant had been convicted of a felony, in order to discredit him, and to attack his credibility." Citing Whart. Cr. Ev. Pp. 434, and a long list of cases.

We quote from 6 A.L.R. 1608:

"It seems to be the general rule that when the defendant in a criminal case testifies in his own behalf, he thereby assumes the position of an ordinary witness, and may be discredited on cross-examination by inquiries as to his previous prosecution for, or conviction of, crime, in the same manner and under the same rules as any other witness." And cites numerous cases.

From the same volume at Page 1635, it is said:

"Even in the absence of a statutory enactment, it is generally held proper to show on cross-examination of the accused that he has previously been convicted of crime, for the purpose of lessening his credibility."

Many of the cases cited in this note go farther than is necessary to go in the instant case. The question propounded to the defendant Velsir related to a conviction of a crime involving moral turpitude and we limit our expression to that extent.

A number of cases involving the question before the Court have arisen in Texas, and the Courts of that state have uniformly held that the accused may be cross-examined as to previous convictions for crime, for the purpose of affecting his credibility, but hold that such convictions must be for crimes involving moral turpitude. See cases listed in note in 6 A.L.R. 1639.

In Clayton v. State (Tex.) 22 S. W. 404, the accused, on trial for robbery, was cross-examined as to his previous conviction of an attempt to commit burglary, to affect his credibility as a witness. The evidence was held admissible for the purpose introduced, since the crime mentioned involved moral turpitude. See also Hargrove v. State, 33 Tex. Crim. Rep. 431, 26 S. W. 993; Bralton v. State, 34 Tex. Crim. Rep. 477, 31 S. W. 379; Williams v. State, 51 Tex. Crim. Rep. 361, 102 S. W. 1134, 123 Am. St. Rep. 884.

It follows that there was no error in permitting the defendant, who had been sworn and testified in his own behalf, to be interrogated on cross-examination as to a previous conviction for burglary in the State of Oklahoma, for the purpose of lessening his credibility as a witness.

3. Appellant argues that the testimony of the medical experts was insufficient to establish beyond a reasonable doubt that the knife wound inflicted by the defendant caused the death of Cox, for the reason that such testimony was based entirely upon "assumptions," "probabilities," and "possibilities." With this contention we are unable to agree.

As above stated, an autopsy was performed on the body of the deceased by Dr. John H. Carlquist, a pathologist, of Salt Lake City, Utah, assisted by or in the presence of Dr. K. E. Krueger and Dr. E. S. Lauzer, of Rock Springs, Wyo. No objection was made to their qualifications as witnesses, nor to the competency of such testimony.

Dr. Carlquist, as a witness in behalf of the State, in his testimony in chief, detailed the various steps taken in performing the autopsy, and after relating the facts revealed by the autopsy, gave his opinion based thereon, as to the cause of death. His opinion as to the cause of the death of Cox is shown by the following questions and answers: Q. Now, I will ask you to state what, in your opinion, caused the death of Earl Cox. A. The cause of death, as I listed it in my finding, was the cerebral congestion—and, by that, I mean the dilation of the vessels in the brain—and the edema of the brain —and, by that, I mean the escape of fluid into the brain that comes with this damage that I have described. I believe that the cerebral congestion and the edema of the brain, with the associated hemorrhage and blood vessel colts involving the left frontal lobe of the brain, that brain involment, itself, was probably the immediate cause of death, and as a contributory factor I have put down the bronchopneumonia ,early, and then, as a secondary contributory factor, I have put down the damage that I found in the wall of the heart. Q. Now, what would be the result· or the reaction upon a pa-

tient who had the brain condition that you have just described? A. The most obvious finding would be evidence of a paralysis. I mean by that, that he might show a mild paralysis, and by "mild," I mean it might be early or it might be late, and by that I mean it might be complete and it might involve only the left side of the body. Q. Now, will you state your opinion, Doctor, as to what caused the brain injury that you stated was the cause of his death, if you know, with respect to your findings? A. From my study, as I stated before, I feel that the hemorrhage in his case was sufficient to produce shock, and that with shock the blood becomes slow throughout the body, and it does not move as freely throughout the blood vessels as it does normally, and with this slowing of the blood there is a possibility of stagnation of the blood taking place, and that it was the stagnation of the blood, with the final clotting of the blood within the small blood vessels, that had produced the damage at this point, because the stagnation of the blood had cut off this part of the brain from its normal supply of oxygen which the brain requires to continue to live. Q. When you speak of a hemorrhage, what hemorrhage do you speak of—that is, when you said that the cause of death was the condition which was due to this hemorrhage? A. In speaking of the hemorrhage, I referred to the multiple small hemorrhages that I found upon the vessels in this part of the brain. Q. What gives rise to that? I mean, what conection or relation, if any, is there between the two cuts that you found and the ultimate brain injury and ultimate death? A. In my opinion, in explanation of that, I believe that the hemorrhage from the cuts had been sufficient to cause shock, and that the shock, in turn, had caused this slowing of the blood stream, which resulted in a stagnation of the blood. Q. In other words, what I want you to state to the jury is your opinion as to whether or not the two

cuts, or either of the two cuts, which you described, the one on the right wrist and the one across the left chest, were the factor which caused the death of Earl Cox. A. I believe that those cuts started the chain of events that terminated in his death. I think those were the initiating factor, or the leading factor, which again led to the slowing of the blood stream, which, in turn, resulted in the marked brain damage that was found. Q. Is it your opinion that these cuts were the direct cause of Mr. Cox' death through the chain of events which you have just described? A. Yes, it is.

Dr. Krueger expressed his opinion as to the cause of death as follows: Q. Do you have an opinion as to whether or not there was any connection between the cut on the wrist and the death of Earl Cox? A. Well, I feel that the cut in the wrist caused the hemorrhage which caused the lowering of the blood pressure which caused the cerebral hemorrhage. Q. And which caused the death? A. Yes.

Dr. Lauzer testified as follows: Q. Do you have an opinion—that is, basing your opinion upon the findings in this post-mortem, do you have an opinion as to the cause of death of Earl Cox? A. Yes. Q. What is that opinion? A. The hemorrhages in the brain as a result of cuts received by him in this brawl, or whatever it was. Q. And that is what caused his death? A. Yes, in my judgment.

There was no medical testimony offered on behalf of defendant on the cause of death.

"The credibility of expert witnesses and the weight of their testimony is for the jury, and the determination of the weight of expert testimony should be by the same rules used by the jury in determining the weight of other testimony. It may be viewed by the jury as advisory and should be weighed in connection with all other evidence, and they may even be disregarded." Underhill's Criminal Evidence, 4th Ed., 436, and cases cited. See also 23 C.J.S. 113 and 114.

It is well settled, of course, that in prosecutions for murder the testimony of medical experts as to the cause of death of deceased may be indispensable—and such is the fact in the instant case. As to the cause of death advanced at the trial, and concluding from all the facts and circumstances, together with the medical testimony, the ultimate question of guilt, or such reasonable doubt of it as would compel acquittal is peculiarly for the jury. There is no conflicting testimony as to the cause of the death of Earl Cox. All the expert medical testimony is to the effect that in their opinion the cut on the wrist started the chain of events that terminated in his death. Their opinion is not in the realm of mere conjecture, but is based on physical findings of existing conditions found in the body of the deceased. It was said in Hollywood v. State, 19 Wyo. 493, 120 Pac. 471, 122 Pac. 588:

"The law is that if the wound was unlawfully inflicted and contributed mediately or immediately to the death, then the one who inflicted the wound is guilty." See also 26 Am. Jur. 191.

4. Counsel for appellant contend that the evidence in this case did not warrant the Court in instructing the jury on the crime of murder in the second degree, for the reason that it failed to establish the fact that the wound was inflicted maliciously. It is not necessary to here review the evidence; suffice it to say that a careful reading of the evidence convinces us that under all the circumstances of this case the Court was justified in giving the instruction.

There is also complaint that the Court should not have given Instruction No. 16 as to the credibility of the defendant as a witness in his own behalf. However, in their brief they "concede that the credibility of a defendant is always a question to be considered by the jury," but claim that under the circumstances of

this case, the instruction should not have been given. We can see no merit to this contention. It has been held in at least two cases in this state, viz: Haines, et al., v. Territory, 3 Wyo. 167, 13 Pac. 8, and Younger v. State, 12 Wyo. 24, 73 Pac. 551, that such an instruction is not improper.

We cannot agree with counsel for defendant in the construction they place on Instruction No. 19; it is a proper instruction (See 26 Am. Jur. 249), and when read in connection with Instruction No. 18, correctly states the law.

Defendant assigned as error the refusal of the Court to give requested Instructions A to F inclusive. However, they are not argued in the brief, (with the exception of Instruction B which will be mentioned) hence they will not be considered. State v. Costin, 46 Wyo. 463, 28 Pac. 2d 782.

The defendant requested the Court in Instruction B to define "reasonable doubt." This the Court declined to do and defendant reserved an exception. The propriety of such an instruction was considered by this Court in State v. Eldredge, 45 Wyo. 488, 21 Pac 2d 545, wherein the Court quoted with approval the text from 8 R.C.L. 220. Sec. 217 as follows:

"And so it is asserted by excellent authority that Courts instructing juries in criminal cases should make no attempt to define the expression but should merely follow the language of the statute that 'where there is a reasonable doubt of the defendant being proven guilty, he is entitled to an acquittal,' or, if there is no such statute, let the words themselves carry their own definition."

And additionally referred to the remarks of Mr. Chief Justice Scott in Claussen v. State, 21 Wyo. 505, 511, 512, 133 Pac. 1055, 135 Pac. 802.

5. Defendant also complains of the refusal of the trial Court to set aside the verdict of the jury for the reason that the evidence conclusively proves that the defendant acted in self-defense.

Sufficient of the defendant's testimony has been set out, we believe, to show the claim of self-defense asserted by the accused. As stated, there were no witnesses to the actual cutting, so the only evidence of self-defense was the testimony of the defendant. The jury may have viewed as significant, the fact that Velsir in relating the matter to several persons shortly afterwards, who later testified as witnesses, at no time mentioned that deceased attacked him with a knife or that he acted in self-defense. The witness Davis, who was on the ground floor of the hotel, was the first person to whom the defendant talked after the wound was inflicted on the deceased, and he testified in part, as follows: Q. Now, did he say why he cut this man? That is, did the defendant say why he cut this other man? A. Yes, he said, 'He threw some crooked dice in the game on me,' or words to that effect. Q. Did he say anything as to the circumstances of the cutting, that is, whether or not he had to do it in self-defense, or anything of that kind? A. No, he didn't.

The witness Losier, to whom Velsir talked a short time later, testified that the defendant said: "I had been up there shooting craps and I caught a fellow cheating me. We got into it, I cut him across the hand."

A short time after these conversations, the defendant was arrested by officers R. C. Erlewine and John Zacovich. Erlewine testified as follows: "On the way up * * * he said he had served more years in the penitentiary than he was old, and he said, 'I meant to kill the son-of-a-bitch. I wish I would have cut his God damned head off,' and when we got him over there

he mumbled something about a man that pulled a pair of crooked dice on him, but just the words, I don't remember."

So far as the evidence discloses, Velsir did not mention that he had been attacked with a knife in the hand of Cox until approximately 3.00 o'clock in the afternoon of the following day when he stated to Deputy Sheriff Pat Lepenske that Cox came after him with a knife. Lepenske also testified that Velsir said he wished he had killed Cox.

The jury undoubtedly considered these circumstances in determining the question of self-defense. It was within their province to believe or disbelieve the testimony which was given. Whatever the truth, however, in this regard may be, the question of self-defense was one for the jury. Palmer v. State, 9 Wyo. 40, 59 Pac. 793; State v. Sorrentino, 31 Wyo. 129, 224 Pac. 420; State v. Aragon, 41 Wyo. 308, 285 Pac. 803; Underhill's Criminal Ev., 4th Ed. 982; 26 Am. Jur. 511.

While counsel for the defendant argu earnestly that the evidence is not sufficient on which to convict the defendant of the crime of manslaughter, we cannot, we think in the light of the record before us, fairly say that the verdict is not sustained by substantial evidence.

The judgment of the trial Court must, accordingly, be affirmed, and it is so ordered.

*Affirmed.*

BLUME, Ch. J., and RINER, J., concur.