319 P.2d 529

The STATE of Arizona, Appellee,

v.

Ethel B. WALLACE, Appellant.

No. 1104.

Supreme Court of Arizona.

Dec. 17, 1957.

Martin S. Rogers, Tucson, for appellant.

Robert Morrison, Atty. Gen., and James H. Green, Jr., Asst. Atty. Gen., and Raul H. Castro, County Atty., Jack I. Podret, Chief Criminal Deputy, and George B. Morse, Deputy County Atty., Tucson, for appellee.

JOHNSON, Justice.

Defendant was convicted of first degree murder, sentenced to life imprisonment, and appeals from the judgment of conviction and the order denying a new trial.

The homicide occurred on November 18, 1956, between 1:00 and 1:30 o'clock p. m. in the back yard of the home of defendant located at 806 South 8th Avenue, Tucson, Arizona.

Defendant has set forth nine assignments of error which are intermingled with facts and arguments but which we have reduced to the following propositions: first, that the evidence was insufficient to justify the verdict; second, the jury was misdirected as to the law; third, that the defendant was erroneously restricted in examining prospective jurors as to the law involved in the case; and fourth, that certain evidence was improperly rejected.

We have carefully examined the evidence and the instructions of the trial court to the jury. The evidence was conflicting as to the facts and circumstances immediately preceding and surrounding the actual commission of the homicide and this court on appeal will not substitute its judgment for that of the jury in a criminal prosecution. The instruction of the trial court fairly set forth the law applicable to the case and we find no error was committed in refusing to give certain instructions offered by defendant.

Defendant urges that the trial court erred in limiting the examination of jurors on voir dire examination relating to the degrees of murder and manslaughter. The extent to which parties should be allowed to examine jurors as to their qualifications cannot be governed by any fixed rules. It is not the province of counsel on voir dire examination to instruct jurors on matters of law. The extent of examination must necessarily be left to the sound discretion of the trial court to determine the presence or absence of bias and prejudice. The trial court correctly and adequately instructed the jury as to the law, and we find no abuse of discretion in limiting the voir dire examination of jurors.

Defendant contends in this court, and repeatedly urged before the trial court, that it was error for the trial court to deny cross-examination of witnesses for the prosecution to show deceased had previously threatened her life, caused disturbances and inflicted her with bodily harm.

It appears from the testimony that the defendant admitted the killing but claimed it was done while under great fear in de-

fense of her home and to prevent bodily harm to her person. The trial court apparently denied the defendant the right of cross-examination of the state's witnesses as to prior difficulties on the authority of Campbell v. Territory, 14 Ariz. 109, 125 P. 717, where this court laid down the doctrine that where the law of self-defense is not in the case, evidence of the hostile feelings or acts of the deceased, or previous quarrels, is irrelevant and inadmissible on the part of the defendant. However, the Campbell case states that where there is a claim supported by some evidence of self-defense, and the proof justifies the giving of a charge on the law of self-defense, the defendant may, for the purpose of showing deceased to have been the aggressor and the killing to have been necessary in self-defense, show hostile feelings on the part of the deceased toward her, previous difficulties, quarrels and the like.

We stated in Burgen v. State, 32 Ariz. 111, 256 P. 111, the question of admissibility of threats is one for the trial court's decision. If, however, there is the slightest evidence tending to prove a hostile demonstration, which may be reasonably regarded as placing the accused apparently in imminent danger of losing her life or sustaining great bodily harm, the threats should not be excluded.

The principle of law is well stated in State v. Velsir, 61 Wyo. 476, 159 P.2d 371, at page 374, 161 A.L.R. 220:

"It is well established that in order to render admissible evidence of the character or reputation for turbulance or violence of the victim of the homicide, a proper foundation must be laid by some evidence tending to show that the defendant in committing the homicidal act acted in self-defense. * * * The necessary preliminary showing or appearance of a case of self-defense may be adduced either in the evidence given in behalf of the state in its main case or by the defendant in his defense; the only indispensable prerequisite is that it precede the offered evidence of the decedent's character." (Citing cases.)

It is also generally recognized that no hard and fast rule of exclusion of evidence may be laid down. A reasonable discretion should be allowed the trial court in determining the relevancy and admissibility of evidence. Where, however, a prima facie showing of self-defense has been made then the evidence of previous difficulties and acts of violent and dangerous character of the deceased should be admitted. It is a well-settled doctrine which has been codified by our legislature that under certain conditions and circumstances one may defend himself against death or great bodily harm. A.R.S. § 13–462. And if a homicide results then the accused may support that defense by evidence of all circumstances of the homicide; and upon a

prima facie showing of self-defense, whether the foundation was laid in the evidence of the state or in that of the defendant, previous difficulties, threats of the deceased, acts of aggression, hostile demonstrations or overt attack sufficient to arouse a reasonable belief in the accused of apparent imminent danger to her life, or the sustaining of great bodily harm to her person, are admissible in evidence; under such conditions the character or reputation of the deceased, if known to the defendant, for being a violent, quarrelsome person, is admissible to show it may well have added to the apprehension of the accused. A determination of whether there was a prima facie foundation of self-defense laid in the evidence of the state requires our setting forth the pertinent testimony of police officers, who testified in the early stage of the trial. Police officer George Robles testified as follows:

"Q. Where did you speak to her? A. In the living room.

\* \* \* \* \* \*

"Q. What was said by you and Mrs. Wallace at that time and place? A. I asked Mrs. Wallace what had occurred and she told me that she had shot Perry and I asked her if she could tell me the circumstances of the shooting, what had happened. She told me that \* \* \*

"Mr. Podret (Deputy County Attorney)

"Give the entire conversation as you recall it.

"A. As I recall it, I asked Mrs. Wallace what happened and her answer was, 'I shot Perry,' and I asked her to tell me what had happened, why she had shot Perry. She told me that he was constantly harassing her and that he had tried to break into the house and I asked her if she could show me _ _ _ asked her to step into the kitchen so she could show me where and what had occurred; she pointed to a window in the kitchen which faces the north. Laying on the kitchen floor was a window pane. Later I looked outside and found a screen, to that window laying on the outside. Also laying on the kitchen floor was a stovepipe. Later I found it was the pipe to the water heater that was adjacent to that window. She told me that Perry had tried to break in and she told him that if he did not stop, that she was going to get a gun and that she was going to call the police. She added that Perry had said that he didn't care who she called. He continued to beat on the window, the window that I described as the one at the kitchen, and when she thought that he was going to break in, she ran to the bedroom, the back bedroom, and took out of a dresser drawer a gun; walked back into the kitchen and fired

at Perry Wallace who by this time had run back to the kitchen door and was standing silhouetted in the doorway. She fired at him. She said that Perry moved from the door.

\*    \*    \*    \*    \*    \*

"Q. Did you have any further conversation with Mrs. Wallace? A. Yes, I did.

"Q. Where was this? A. This was in the living room.

\*    \*    \*    \*    \*    \*

"Q. What was said by the various people at that time and place? Give the entire conversation as you recall. A. Well, I continued to ask Mrs. Wallace about whether Perry had attempted to break into the house or not and she said that he had torn the screen off of the window in the kitchen and then going back to the shooting, actual shooting, I asked her particularly if Perry had made any outcries, if he had screamed, if he had cried, if he had yelled; at this time she said, 'Yes, he said, "Please don't kill me"'.

"Q. Did she say where he was when he said this? A. He was in the back yard, sir.

"Q. Did she say where she was? A. She was in the kitchen. That was after she had gotten the gun.

\*    \*    \*    \*    \*    \*

"Q. Now you had a later conversation, you said? A. That's right.

"Q. That took place where? A. At the Police Station.

\*    \*    \*    \*    \*    \*

"Q. And what was said by Mrs. Wallace or anyone there at that time and place? A. Well, in speaking to her and asking her about this - - - what had occurred, she told me - - - she told us that she had continued to fire at Perry and exhausted the ammunition in her gun and went back and reloaded and came back and shot another round and we asked her in particular if Perry had made any cries and any screams and she was non-committal and she did not answer and I asked her if she had ever seen him fall and she said no, she couldn't remember. I asked her if she had observed him slumped to the ground, fall against the fence or I asked her if as far as she knew, whether she had hit him or not and she said she didn't know. I asked her in particular when the last time was that she had seen Perry Wallace. She told me the night before the shooting; that would have been Saturday. I asked her if she were friendly with Perry Wallace and she said not particularly but then she told us, told Mr. Coates and I, that he had come to her house about two weeks prior to that and that she was working in the back yard; that he had come into the back yard and her words were,

'that he was a very forceful man. He gets what he wants. We went back into the house, into the bedroom.' I asked her if she had relations with him. She didn't answer. She thought about it; she said, 'He is a very forceful man. I repeat, he gets what he wants.' We continued to ask her if she realized that she was going to be charged with a crime and she said yes and we asked her if she knew what the crime was going to be. As near as I can remember, she said, 'Well, I may be charged with manslaughter. I don't know.' I can't think of any other conversation at this time, Mr. Podret."

The following appears from the cross-examination of Officer Robles:

"Q. Now when you first spoke to her in the living room, you do recall that her first statement was when you asked her what had happened that she said that Perry Wallace was trying to break into the house and was constantly harassing her, those are the statements that you recall her using? A. Yes, sir, that's true.

"Q. And further that she told you that if Perry did not * * * if he tried to break in that she would stop him even if she had to go get a gun? A. Yes, sir.

"Q. And further that Perry then responded that he didn't care who she called; that he wasn't going to stop? A. That's right.

"Q. Now you investigated one previous occurrence when Mrs. Wallace had fired a shot at Perry Wallace to keep him from coming in the house several months before, didn't you?

"Mr. Morse: (Deputy County Attorney)

"Make the same objection, Your Honor.

"The Court: Sustained."

Police officer Dudley M. Lewis, a witness for the state, testified in part as to conversation with defendant as follows:

"Q. Now would you repeat that conversation, please? A. I asked Mrs. Wallace what happened and she said she didn't want to talk about it and I said, 'All right.' Then she said she would like to have a cigarette, which someone came up with. She sat there a few moments and then she said, 'He came to the house and tried to break in', and I said, 'Then what happened.' She said, 'Well, he tried to break in the window', referring to the window either by words or by motion.

* * * * * *

"Q. Go ahead with the conversation. A. I asked then what happened. She said he said if she didn't let him in he was going to kill her. I said

then, 'What did you do.' She said, 'I told him I would call the police and he said it will be the last time you call the police on me.' and she said, 'I am going to go get my gun.' and she said, 'I went and got my gun and shot at him through that window.'

"Q. Shot at him through that window? A. She said through the window. She said, 'He run around to the back door and tried to get in.' and she said, 'I shot at him through the back door and then I stepped outside the back door and shot at him until the gun was empty.'

\*　　\*　　\*　　\*　　\*　　\*

"Q. She said she shot through the window? A. Yes.

"Q. And through the door? A. She said she shot through the window at Perry. She called him by name. She said she had had to do it. That is the last words she said to me. She said, 'I had to do it'."

The question for our determination is whether a prima facie case of justifiable homicide was established at the foregoing stage of the trial which entitled defendant to cross-examine the state's witness in connection with previous difficulties and the like. Unquestionably there is a prima facie showing of the fact that the deceased was attempting to break into the home of the defendant under circumstances which clearly show deceased to be the aggressor, and which would certainly instill great apprehension and fear on the part of the defendant for her life or the sustaining of great bodily harm to her person. We hold under the circumstances in this case the trial court committed reversible error in refusing defendant the right to such cross-examination.

For the reasons herein stated the case must be reversed for a retrial and it is so ordered.

UDALL, C. J., and WINDES, PHELPS and STRUCKMEYER, JJ., concur.