## STATE v. ELDREDGE
(No. 1788; May 2, 1933; 21 Pac. (2d) 545)

For the appellant there was a brief by *Linn I. Noble* and *C. R. Ingle,* both of Thermopolis, Wyoming, and oral argument by *Mr. Ingle.*

490

For the respondent, there was a brief by *J. A. Greenwood,* Attorney General; *R. J. Jackson,* Deputy Attorney General; *George W. Ferguson,* Assistant Attorney General, and *R. Dwight Wallace,* Assistant Attorney General, all of Cheyenne, Wyoming.

494

RINER, Justice.

Jennings Eldredge, who brings this case here by direct appeal, was found guilty of murder in the second degree by the verdict of a jury in the District Court of Hot Springs County and a judgment was entered thereon sentencing him to serve a term of from 30 to 50 years in the state penitentiary.

Briefly, the circumstances of the homicide may be stated in outline as follows: On the night of October 5th, 1931, two men, named William Carlson and Ernest Bloom, left their boarding house at Gebo, Wyoming, and went to a house about a quarter mile west of Kirby, in the county aforesaid, in which for some years past, a colored woman by the name of Bessie Williams had lived. Carlson and Bloom had both been there before. On the evening of the date above mentioned, both men had been drinking, Bloom carried some liquor with him in a flask, and Carlson testified they went to this house to obtain more. The structure faced south, approximately, and was entered through a closed porch directly back of which and to the north was the living room. West of the living room and opening into it was a third room, in the rear of which was

a fourth room used as a bedroom. The living room, which was larger than either of the other two, also had a bed in it, placed along the north wall. At the time these men arrived at the house, which occurred around two o'clock in the morning, there were four people, all colored persons, in it. Bessie Williams and a man named O'Donnell were in the bed in the living room, and Bertha Williams, the daughter of this woman, and the defendant Jennings Eldredge were in bed in the fourth room above mentioned. Eldredge, a janitor in a bank in Thermopolis, Wyoming, had never met either of the men first above mentioned.

Carlson testified that they came to the porch door, knocked, and were admitted by Mrs. Williams. The latter testified, as did also O'Donnell, that these men kicked at the door and threatened to break it down if they were not admitted. Upon entering, they found a kerosene lamp burning on the table, and immediately demanded liquor but were told by the woman that there was none. Bloom then produced the bottle with the liquor he had and all four appeared to have joined in consuming it. The party became noisy and then, according to O'Donnell's testimony, Bloom asked him where the other girl was and was told she was in the other room. Bloom then said, "I believe I will go in there," to which O'Donnell responded, "If I were you, I would not go in there." Mrs. Williams also testified that she said to Bloom, "Don't go in that room." There was no light in either the third or the fourth rooms and the doors, apparently swing doors, between those two rooms were closed. The doorway leading from the living room into the third room was unobstructed. Despite these warnings, Bloom went on into the third room out of sight of the three people in the living room. Shortly thereafter, they heard scuffling. The defendant testified that someone pushed open the doors of the fourth room, whereupon, in his underclothes, he jumped out of

bed and said, "Don't come in here," several times; that this fellow then grabbed him and hit him in the stomach; that he fell against the stove in the fourth room where he had put his clothes and his pistol; that he got his gun and held it against his stomach to protect himself against the fellow's beating; that this fellow was a bigger man and was holding and hitting him; that he shot into the floor several times in the course of the scuffle; that "then he throwed me around, beating on me all the time and right along here, why we turned this way and I jerked loose from him and he throwed his hand to his hip and I shot." The two men were struggling in the third room when the shooting occurred. Bertha Williams testified that she heard the defendant warn the other man not to come in the room where they were, but that it was dark and she could not see whether they had hold of each other; that she didn't pay much attention, she was scared; that Bloom did not at any time get into the room where she was. After the homicide occurred, a knife, usually left in the closed porch of the house, and the property of Mrs. Williams, was found lying next to the hand of the deceased. Immediately after the shooting, the defendant came out into the living room and directed O'Donnell and, later, Bertha Williams to go for the sheriff or his deputy. The latter arrived soon after and persuaded the defendant to turn over to him his pistol and submit to arrest. There is testimony that the defendant also was intoxicated when the shooting took place.

Certain questions are submitted in the briefs of counsel concerning the legality of the jury list, from which the panel was drawn, that supplied the jurors who tried the case. Since these briefs were filed, the case of State v. Radon, 45 Wyo. 383, 19 Pac. (2d) 177, was decided. In that case, identical questions were presented and disposed of adversely to appellant's contentions.

Consequently, in the oral argument on the case at bar, these matters were not presented and it will not be necessary to consider them here.

The court declined to give certain instructions requested by the defendant, one of them reading:

"If, after consideration of the whole case, any juror should entertain a reasonable doubt as to the guilt of the defendant, it is the duty of such juror, so entertaining such doubt, not to vote for a verdict of guilty, nor to be influenced in so voting, for the single reason that a majority of the jury should be in favor of a verdict of guilty."

And the other:

"You are instructed that as long as any single juror entertains a reasonable doubt as to the guilt of the defendant, he should not just for the purpose of the jury arriving at a verdict, vote for conviction. But in this connection you are instructed that it is your duty as jurors to give due consideration to the opinions and views of your fellow jurors."

Regarding the proposition contained in the instruction first above quoted that a juror entertaining a reasonable doubt should not be influenced in voting for a verdict of guilty merely because a majority of the jurors believed the defendant to be guilty, it may be remarked that, while this is of course true as an abstract principle of law, yet, as said by the court in People v. Singh, 20 Cal. App. 146, 128 Pac. 420, 422, where a quite similar instruction was under consideration:

"The subject-matter of the requested instructions was substantially embodied in the oath administered to the jurors 'that they and *each* of them' would 'well and truly try the matter at issue * * * and a true verdict render according to the evidence.' The requested instructions were, in effect, simply admonitory and cautionary of the

sworn duty of the jurors, and merely told them to do what they should do without any instruction upon the subject."

And it was held that the refusal to give such an instruction was not reversible error. See, also, People v. McNabb, 63 Cal. App. 755, 219 Pac. 1028. Relative to the admonition of its being the duty of each juror not to vote for a verdict of guilty, if he entertained a reasonable doubt, as suggested in both of the proposed instructions, it is, perhaps, sufficient to say that an instruction embodying this proposition was quite fully considered in State v. Flory, 40 Wyo. 184, 276 Pac. 458, where it was held not error to refuse to give it. We think that that is so here.

Complaint is made concerning both the giving and refusing of a number of instructions detailing to the jury the law governing murder in the first degree. Inasmuch as the defendant was not found guilty of that crime, it is obvious that he was not prejudiced by the giving or refusal to give instructions relating thereto. Ross v. State, 8 Wyo. 351, 387, 57 Pac. 924; Downing v. State, 11 Wyo. 86, 70 Pac. 833, 73 Pac. 758. In this connection, we may say, however, as the evidence in the case is now presented to us by the record here, we consider it doubtful whether defendant could lawfully have been convicted of any higher degree of crime than that of manslaughter and, consequently, that the trial court should have limited the jury's consideration of the case to that extent. We say this inasmuch as, for additional reasons presently to be mentioned, the case must go back for a new trial. It may be, of course, that other evidence may be forthcoming upon a re-examination of the issues.

Complaint is made that the trial court declined to give instruction No. E reading:

"You are instructed that a person occupying a room as a guest or with the consent of the person lawfully in possession thereof, is not obliged to flee. If such person is assaulted, or an unlawful attempt is made to invade such habitation, he may repel force by force, and if in the reasonable exercise of his right of self defense, and of using no more force than is apparently necessary in defense of himself or habitation, he kills his assailant, the killing is justifiable homicide.

"The jury, in considering whether the killing was in defense of habitation, should consider all the circumstances attending the killing and the conduct of the parties at the time and immediately previous thereto, or whether it was done maliciously and in a spirit of revenge or hatred."

We think that this instruction was properly refused for several reasons. First, because defendant's testimony was all to the effect that he shot in defense of his person,—he was "scared to death of him" (Bloom)—and it is undisputed that the shooting occurred without the bedroom and after the parties had been scuffling in the third room. Williams v. State, 149 Ark. 601, 233 S. W. 776; Pennington v. Commonwealth, (Ky.) 68 S. W. 451, 24 Ky. L. Rep. 321. Secondly, there was not the slightest evidence in the case of the act being done "in a spirit of revenge or hatred." The defendant apparently was not acquainted with the deceased at all. His testimony is that he did not know who the person was in the darkness of the room where the homicide occurred.

Instruction No. 13 given by the court over defendant's objection and exception was as follows:

"You are instructed that a doubt arising from mere whim or groundless surmise or conjecture or, desire for more evidence of guilt or suggestion by counsel, or arising from a merciful disposition, or kindly feeling, or from sympathy for the Defendant, is not a reasonable doubt, and if, after due deliberation, the jury is possessed of no

good reason to doubt the Defendant's guilt, it is the duty of the jury, under their oath, to find the Defendant guilty.''

This is assigned as error. We think it was. In Sheppard v. State, 94 Ala. 102, 10 S. 663, commenting on an instruction framed in this language: ''The court charges the jury that if any juror, before pronouncing a verdict of guilty, feels the desire for more evidence tending to show the guilt of defendant, then that juror has the reasonable doubt of the defendant's guilt upon which the law requires him to acquit the defendant,'' the court said:

''The fact that a juror feels a desire for more evidence of criminality is not *necessarily* the equivalent of a reasonable doubt of guilt in the mind of such juror. A juror might well 'feel a desire' for more evidence, and naturally would experience such desire in all cases where he entertained any doubt whatever of guilt, whether that doubt were a reasonable one or not, in itself; and manifestly a desire for further proof, resulting from a mere unreasoned misgiving, would not involve a state of mind on the part of the juror which would make it his duty to acquit. These considerations demonstrate the infirmity of the third charge requested by the defendant.''

We have italicized the significant word ''necessarily.'' It will be observed that the instruction at bar is to all intents and purposes the negative form of the instruction quoted from the Alabama case and is, we think, equally misleading and objectionable. While it is true that a ''desire for more evidence of guilt'' may spring from a mere whim or misgiving, yet that is not ''necessarily'' so. It may arise in a juror's mind because he feels that there is an entire absence of evidence on a vital element in the case and, if it does so, it is plain that he would have a reasonable doubt of the defendant's guilt. The fact that other instructions were given wherein an approved definition of the term ''reasonable doubt'' was set forth does

not help the matter. Palmer v. State, 9 Wyo. 40, 59 Pac. 793, 87 Am. St. Rep. 910; State v. Radon, supra; Ballard v. State, 19 Neb. 609, 28 N. W. 271; Marcoguiseppe v. State, 114 Oh. St. 299, 151 N. E. 182. In this connection, we may with propriety refer to the statement of a well known text (8 R. C. L. 220, § 217) where, after pointing out that courts, in the endeavor to explain the expression "reasonable doubt," have "occasionally led juries into mazes of subtlety and casuistry in which they were lost themselves, and into which the minds of plain men are incapable of following them," the text further quite sensibly remarks:

"And so it is asserted by excellent authority that courts instructing juries in criminal cases should make no attempt to define the expression but should merely follow the language of the statute that 'where there is a reasonable doubt of the defendant being proven guilty, he is entitled to an acquittal,' or, if there is no such statute, let the words themselves carry their own definition."

See also the remarks of Mr. Chief Justice Scott in Claussen v. State, 21 Wyo. 505, 511, 512, 133 Pac. 1055, 135 Pac. 802.

Instructions Nos. 17 and 18 given by the court and excepted to by the defendant in the case at bar are substantially identical with Nos. 8 and 16 employed in the case of State v. Radon, supra. It was there held that the giving of these instructions was prejudicial error as not correctly stating the law of self-defense, and the judgment was reversed. The same result must follow here.

Our attention has been directed to several affidavits in the record, submitted to the trial judge as a part of the record on appeal, to the effect that during the forenoon of the 29th day of January, 1932, and before the jury had returned their verdict in the case, they were allowed to go to the post office and to inquire for and receive

mail. The record shows that the cause was finally submitted to them for their determination at noon on the preceding day, January 28th. These affidavits were not traversed. The first sentence of Sec. 33-1001, Wyo. Rev. St. 1931, provides in substance, among other things, that in criminal causes the proceedings in civil cases as to the conduct of the jury shall govern when applicable and "it is not otherwise provided." Sec. 89-1308, relative to the deliberation and custody of juries in civil cases, reads in part:

"The officer having them under his charge shall not suffer any communication to be made to them, nor make any himself, except to ask them if they have agreed upon their verdict, unless by order of the court."

The act of the officers in charge of the jury in this case, in allowing the members thereof to thus receive mail was in direct violation of the statute. We cannot too strongly express our disapproval of such a practice. Under the analogous doctrine, in Nicholson v. State, 18 Wyo. 298, 106 Pac. 929, relative to the separation of the jury after being duly sworn in the case, a presumption of prejudice would arise which, if not overcome by satisfactory proof to the contrary, would entitle the defendant to a new trial. It has been held that it was error to deny a new trial where a sealed letter was delivered to a juror after the jury had retired to consider their verdict. State v. Bland, 9 Ida. 796, 76 Pac. 780, 783; State v. McCormick, 20 Wash. 94, 54 P. 764. In the first of these cases last cited, the Idaho court very well said:

"This kind of practice should never be permitted. The letter delivered to the juror may have been, and perhaps was in good faith and concerning the juror's private and family affairs, but it might be equally true that it was concerning this case alone. Such a practice opens too wide a door for unfair methods, and is too liable to create in the minds of the parties to the action a feeling of uneasiness

and suspicion which can easily be avoided. If a juror to whom such communication is directed is not willing for the trial judge in open court to open and read such letter and submit it to the attorneys for the respective parties before delivering to the juror, then it should not be delivered until the jury is discharged. Where such communications are permitted without the litigants knowing the contents, it is but natural for the defeated party to feel or suspect that the letter contained something which has prejudiced his rights.''

A great many assignments of error have been presented and argued relative to remarks made by the trial judge, in connection with the making of rulings upon the admission or rejection of evidence, which remarks are alleged to have been prejudicial to the defendant. We have examined them all with care and do not believe that, by them, the judge intended or uttered any unfair comments so far as the defendant is concerned. It may possibly be that some were superfluous but we do not consider them to have been harmful. Inasmuch as the case must be retired and as it is unlikely that they will again be used, it is unnecessary to occupy space in this opinion in discussing them. Errors are urged based on the allowance by the trial court of leading questions. But so far as we can see, the discretion vested in the trial judge in that respect was not abused. 17 C. J. 245. An examination of the record discloses that counsel on both sides of the case seem to have employed leading questions with considerable freedom, but the defendant's attorneys appear to have insisted on the enforcement of the rule somewhat more stringently than counsel for the state.

On January 29, 1932, and during the course of the deliberations of the jury, the court received a communication from their foreman. The jury were thereupon ordered to appear in court, and in the presence of counsel, the court stated that he had received from their foreman

a communication reading, "Can we add to second degree, 'without leniency'?" The court then stated to the jury that they had the privilege of adding the two words above quoted, and that any suggestion of the jury added to or endorsed on the verdict by the jury would be considered by the court. The jury retired and when the verdict was returned it read:

"We, the Jury duly impanelled and sworn to try the above entitled case, do find the Defendant guilty of murder in the Second Degree, without leniency."

Complaint is made that the court erred in its disposition of the matter. We cannot agree with the contention. The recommendation of the jury, "without leniency," was not binding upon the court. It could be regarded or disregarded, as the court viewed the ends of justice in the case. In Winburn v. Commonwealth, 181 Ky. 183, 203 S. W. 1073, the jury returned a verdict, "We the jury find, the defendant, James Winburn, guilty, and fix his punishment at confinement in the state penitentiary for life, without pardon." Holding that there was no error in receiving the verdict or in its form, the court said:

"But it is argued that the verdict was unauthorized, because no statute gives to the jury the right to fix such an unusual punishment. In this connection it is argued that the jury might not have agreed upon a verdict at all if the trial court had required them to eliminate from the verdict the words 'without pardon.' If speculation of this kind be proper, we might say, with equal plausibility, that the jury might have inflicted even a higher penalty had they not felt free to incorporate the words complained of in the verdict. However, this may be, we conclude that the incorporation in the verdict of the words 'without pardon' did not invalidate the verdict, but constituted a mere recommendation which the court had the right to disregard as surplusage. This has been

the uniform rule respecting verdicts otherwise proper, but containing recommendations of the accused to the leniency of the court (State v. Overton, 85 N. J. Law 287, 88 Atl. 889; People v. Lee, 17 Cal. 76; State v. Stewart, 9 Nev. 120; Penn v. State, 62 Miss. 450; State v. Rosa, 26 La. Ann. 75; State v. Newman, 49 W. Va. 724, 39 S. E. 655), and if a favorable recommendation may be rejected as surplusage, we perceive no reason why an unfavorable recommendation may not also be rejected."

For the reasons set forth above, the judgment of the District Court is reversed and the case remanded for a new trial.

*Reversed and Remanded.*

KIMBALL, C. J., and BLUME, J., concur.