**Leroy Ralph ROMO, Appellant (Defendant below),**

**v.**

**STATE of Wyoming, Appellee (Plaintiff below).**

**No. 4020.**

Supreme Court of Wyoming.

Aug. 31, 1972.

John A. MacPherson, of Brimmer & MacPherson, C. L. Bates, Rawlins, for appellant.

Clarence A. Brimmer, Atty. Gen., Frederic C. Reed, Asst. Atty. Gen., Cheyenne, for appellee.

Before McINTYRE, C. J., and PARKER, McEWAN, and GUTHRIE, JJ.

Mr. Justice McEWAN delivered the opinion of the court.

At approximately 7:30 a. m. on January 1, 1971, in the city of Rawlins, Wyoming, Arthur Foster was fatally shot with his own .25 caliber semiautomatic pistol. The defendant was charged with the crime of murder in the second degree for the killing. The jury returned its verdict in which it found the defendant guilty of the

crime of manslaughter [1] for which he was sentenced to a term of not less than eight years and not more than ten years in the Wyoming State Penitentiary.

On January 1, 1971, the defendant was 22 years of age, and an 11-months resident of Rawlins. His parents also lived in Rawlins. His formal education ended in the eighth grade and he was employed as a busboy at a local restaurant. On the evening of December 31, 1970, defendant and his girl friend visited several bars in Rawlins. Defendant had several drinks during the evening and became "high." He and his girl friend danced at several of the places, and some time after 3 a. m. went to the American Legion Club where they met the deceased, whom neither of them had known previously. At the invitation of the deceased the three then proceeded in the decedent's car to a place called the Townsend Club.. While they were still in the car the defendant's girl friend asked to be —and was—taken home. Defendant and deceased then returned in decedent's car to the Townsend Club. While they were parked in front of the club and deceased and defendant were conversing, deceased removed a pistol from his coat pocket and showed it to defendant, asked the defendant if he had any weapons, and the defendant showed him his pocket knife. Decedent placed the pocket knife in the glove compartment of his car where it was later found by police. Decedent apparently put the pistol back in his pocket. They then went into the Townsend Club, sat in a booth and ordered drinks. There was testimony that earlier, at about 5:30 a. m. at another bar and restaurant, decedent became angry with his wife and friends and was generally belligerent to everyone there present, had been drinking excessively, and was staggering. The pathologist who performed an autopsy testified that deceased had a blood alcohol content of 200 milligrams and was drunk.

The deceased and defendant had some discussion concerning money while in the Townsend Club, and deceased told the proprietor of the club that he wanted to leave because he did not want to cause any trouble in the proprietor's place of business. The decedent and defendant then left the club via the front door. The defendant was the only witness to what transpired immediately after leaving the club. He said he went out first, and, upon reaching the bottom of the outside stairs, heard the deceased say something which he did not understand. He turned around and saw deceased pull the gun from his pocket and say, "I am going to do to you what I am going to do to all Chicanos," and pointed the gun at the defendant. A struggle ensued and deceased was killed by a bullet in the head which was fired from his gun. The deceased was approximately 5'8" tall and weighed 200 to 250 pounds, and the defendant was about 5'4" tall and weighed about 125 pounds. The proprietor of the Townsend Club, upon hearing a shot in front of the building, went to the window and saw deceased lying on the ground and called the police. He then went outside and had a conversation with the defendant who told him the decedent had shot himself and the gun was under the body, and asked him to call the police.

Defendant, who had decedent's gun in his possession, then walked swiftly away from the scene and proceeded to the home of his parents. While walking fast, or running, defendant pointed the gun and

1. Section 6–58, W.S.1957, provides: "Whoever unlawfully kills any human being without malice, expressed or implied, either voluntarily, upon a sudden heat of passion, or involuntarily, but in the commission of some unlawful act, or by any culpable neglect or criminal carelessness, is guilty of manslaughter, and shall be imprisoned in the penitentiary not more than twenty years." The three possible verdicts as submitted to the jury for their consideration included not guilty, guilty of murder in the second degree, and guilty of manslaughter. The jury, in arriving at the guilty verdict of manslaughter delineated the word "manslaughter" on the proposed verdict form and interlineated the words "involuntary manslaughter."

fired a shot at a lady who was walking down the street. Upon arriving at the home of his parents defendant changed his clothes and laid the gun on a chair where it was later recovered by the police. He left the house after a few minutes and was arrested shortly thereafter about a block from his parents' residence. He was taken to the scene of the shooting by police officers and then to the Rawlins Police Department where he was questioned by Detective-Lieutenant J. C. Jacobson, a member of the Rawlins Police Department, who said that the defendant appeared to have been drinking and was frightened.

The defendant in his brief enumerated five specific points upon which he relied for reversal. One of the contentions raised by defendant was that the trial court erred in not granting a mistrial on the grounds of jury impropriety. We think the defendant's point is well taken, and since we hold that the matter must be sent back to the trial court for retrial we need not discuss the other points raised in the appeal.

The trial commenced on the morning of March 15, 1971, and continued until the afternoon of March 18, when the evidence was closed. The matter was submitted to the jury on the morning of March 19. On the morning of March 17, one of the State's principal witnesses, Detective-Lieutenant J. C. Jacobson, testified. He had been a member of the Rawlins Police Department for ten years and was in charge of the investigation of the death. He interviewed the defendant on three different occasions, and on two of the sessions the questions and answers were taken in shorthand by a secretary. The transcribed statements were received into evidence just prior to the noon recess, and the jury was advised by the court that after lunch the statements would either be read to them or they could read them. Several of the answers given by the defendant to Officer Jacobson—and testified to by him—were proved to be inconsistent with the evidence. He recovered the gun with which

Mr. Foster was killed and determined that Mr. Foster was the owner of the gun, and that a knife found in the glove box of decedent's car belonged to defendant. He prepared the "arrest sheet" which was introduced as one of the State's exhibits.

Officer Jacobson had testified until the noon luncheon recess. At that time the jurors went to lunch and at least three of them went to the Ferris Hotel dining room. Three of the jurors were seated at a table when the witness and Rawlins Chief of Police Charles Oates came into the restaurant. Officer Jacobson and Chief Oates sat at the same table with the three jurors during the lunch hour. Counsel for the defense came into the restaurant a few moments later and observed the officers sitting with, and talking to, the jurors.

Following the luncheon recess defense counsel, in chambers and out of the presence and hearing of the jury, moved the trial court for a mistrial and cited what had transpired as to the police officers and the jurors. One of the defense counsel advised the court that while he could not hear most of the conversation between the police officers and the jurors he did hear them talking about game wardens and concluded they were talking about law enforcement. Counsel also advised the court that Chief Oates had supervised the investigation of the alleged crime and had been present in court.

The trial court then called the two police officers into chambers and questioned them about what had transpired at lunch. Chief Oates advised the court that he did not realize the three people were jurors when he sat with them, and Officer Jacobson said that although he knew they were jurors he assumed it would be all right if he sat with them so long as they did not "talk about business." The chief also stated that when they walked into the restaurant they were looking for a place to sit when one of the jurors said, "You had better take these seats here. These are the only ones in the house." Both defense counsel went to the

restaurant shortly after but at about the same time as the two police officers and sat at a vacant table which Officer Jacobson acknowledged he had seen. Both officers said they had discussed only hunting and fishing with the jurors. The three jury members were not questioned by the trial court. The trial court clearly recognized that this posed a serious question and said, "The impropriety is awful. There is no question about that," and, overruling the motion for mistrial, said, "Allright gentlemen, you have got grounds for reversal."

The question of the conduct of a jury is not new or unique in Wyoming. As early as 1910 this court pointed out that the conduct of a jury—like Caesar's wife—must be above suspicion. At common law it was necessary in felony trials to keep the jury together in charge of an officer so they did not separate and thereby become accessible to any communication being made to them. 23A C.J.S. Criminal Law § 1356, p. 950. Wyoming, since territorial days, has had statutes that prohibit unauthorized contact with jurors, and recently the district courts of Wyoming adopted a uniform rule to ensure that jurors would not be contacted by counsel even following the rendition of their verdict.[2]

An annotation in 9 A.L.R.3d 1275, 1282, lists Wyoming as one of the several states which follow the view that:

"* * * an improper communication between a juror and a witness in a criminal trial is rebuttably presumed prejudicial to defendant and that once shown to have taken place, the burden is on the prosecution to demonstrate its harmless effect."

This annotation cites Nicholson v. State, 18 Wyo. 298, 106 P. 929, as demonstrating that Wyoming adheres to the rule. An analysis of Wyoming cases discussing the subject would indicate that we have long held to that view.

In 1910 this court in the *Nicholson* case expressed the view as contained in the A. L.R. annotation. In that case there were charges of misconduct of jurors in that two of them separated unattended from the balance of the jury, and one juror went into a store and also into a bank. The jury was at different times during the progress of the trial permitted to separate and scatter about a hotel at mealtimes, and to intermingle among the people, guests, and witnesses for the State. In that case this court said at 932:

"* * * that when a defendant in a capital case has shown a separation of the jury, or an opportunity for other parties, and especially witnesses, to communicate with them in violation of the statute, and it appears that defendant was prejudiced, or that it does not appear that he was not prejudiced thereby, a new trial should be granted. * * *"

It was there held that it was error for the trial court to refuse to grant a new trial on the ground of the misconduct of the jury, and the case was reversed and remanded for new trial.

This court again addressed itself to that question in 1933 in the case of State v. Radon, 45 Wyo. 383, 19 P.2d 177. In that case the defendant was convicted of first degree murder and was sentenced to be hung. While this court reversed and remanded the case on other grounds, it nonetheless noted that greater care should, in another trial, be taken in guarding the jury so that no communication could be had with them. The *Nicholson* case was also cited.

Again in 1933 we had occasion to examine the same question in State v. Eldredge,

---

2. Rule 16 of the Uniform Rules All District Courts of Wyoming, became effective October 1, 1970, and provides: "Following the rendition of a verdict by a petit jury, counsel in the case shall not thank the jury for their verdict and shall not interview the jurors nor interrogate them as to how their decision was reached nor concerning any matter occurring during their deliberation."

45 Wyo. 488, 21 P.2d 545. In that case, wherein the defendant was found guilty of murder in the second degree, the members of the jury were allowed to go to the post office and inquire for and receive mail. A portion of one of our statutes [3] which provides that the officer having the jury under his charge shall not suffer any communication to be made to them, was cited.

The court said that the act of the officers in charge of the jury in allowing members thereof to receive mail was in direct violation of the statute. The court further said at 548:

"* * * We cannot too strongly express our disapproval of such a practice. Under the analogous doctrine, in Nicholson v. State, 18 Wyo. 298, 106 P. 929, relative to the separation of the jury after being duly sworn in the case, a presumption of prejudice would arise which, if not overcome by satisfactory proof to the contrary, would entitle the defendant to a new trial. * * *"

The judgment of the district court was reversed and the case remanded for new trial.

Again in 1945 this court had an occasion to address itself to the question of jury conduct. State v. Goettina, 61 Wyo. 420, 158 P.2d 865. In that case a deputy sheriff comingled and talked with various of the jurors at various times. He had been instructed by the sheriff to see that members of the jury did not comingle with any of the patrons in a cafe. Two bailiffs were in charge of the jury. Several of the jurors made affidavits in which they said they had sat at the same dinner table with the deputy sheriff but the conversation was purely casual and at no time was the case mentioned or discussed. This court then cited the rule in the *Nicholson* case in rela-

tion to misconduct of the jury and said at 886:

"* * * The trial court had the right, we think, to conclude from the affidavits that Tom Lavery [the deputy sheriff] did not discuss with the jurors anything relating to the case, and, hence, we must conclude that no ground for a new trial has been shown. It is regrettable, of course, that the sheriff, on his own responsibility, ordered Lavery to watch the jury, instead of getting an order of the court to that effect. Even suspicions that justice might be perverted should be avoided."

It should also be noted that the case at hand is different from any of those cited in that the witness who comingled with the jury was a police officer and also a principal witness for the prosecution, and therefore, a part of the prosecution team. It is also different in that no inquiry was made of the jury members to determine if the communications were such as to be not prejudicial to the defendant.

The Supreme Court has recently discussed a related issue wherein members of the sheriff's office who were witnesses also were in charge of the jury, which cases point out the potential problems of using sheriffs or deputies as bailiffs. Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424, and Gonzales v. Beto, 405 U.S. 1052, 92 S.Ct. 1503, 31 L.Ed.2d 787.

Under the circumstances of this case the trial court should have granted the defendant's motion for mistrial on the grounds of jury conduct.

Reversed and remanded for new trial.

Mr. Justice PARKER, dissenting.

The prevailing opinion is grounded on what in my view are two fundamental er-

---

3.  Section 89–1308, R.S.1931 (now § 1–126, W.S.1957), provides: "* * * the officer having them under his charge shall not suffer any communication to be made to them, nor make any himself, * * *"

rors, one of the applicable law and one of the facts as disclosed by the record. Accordingly, I must dissent.

The law upon which the opinion seems to be largely predicated stems principally from Nicholson v. State, 18 Wyo. 298, 106 P. 929, which interprets and applies § 5385, Rev.St.1899 (now § 7–237, W.S.1957), providing, inter alia:

> "* * * In the trial of *capital* cases the jury shall not be permitted to separate, after being sworn, until discharged by the court. In other felonies and misdemeanors, the separation of the jury may be permitted in the discretion of the court, until charged, after which no separation shall be allowed until discharged." (Emphasis supplied.)

The instant prosecution was *not* a capital case, and what was said in Nicholson is inapplicable. Moreover, a reasonable interpretation of that case showed a new trial should not be granted unless there was a showing of prejudice or unless it did not appear that the defendant was not prejudiced.

Although the majority opinion emphasizes the offhand remark of the court that defense counsel had grounds for reversal, it omits the fact that defense counsel objected to cross-checking with the jurors and likewise fails to state the judge's ultimate ruling on the point when he said, "this can be considered as harmless error as long as nothing was mentioned with respect to any matter pertaining to this case. I think there has to be come substantial right of the defendant jeopardized before a mistrial comes up, and this is a borderline case, but I am going to take a stand that there was nothing that was prejudicial to the defendant."

What I have said should in no way be interpreted to excuse the reprehensible conduct of the officers, who were sufficiently within the jurisdiction of the court to have justified a citation for contempt.