John Frank **BENTLEY**, Appellant,
(Defendant below),

v.

**STATE of Wyoming**, Appellee,
(Plaintiff below).

No. 4008.

Supreme Court of Wyoming.

Oct. 24, 1972.

Franklin Luke Singer. The jury returned a verdict finding defendant guilty of manslaughter and he was sentenced to the Wyoming State Penitentiary to a term of not less than 5 nor more than 15 years. The defendant has been free on a $10,000 bond pending the determination of this appeal.

On April 1, 1969, defendant married Robin Singer and remained married to her until January 13, 1970, when he obtained a decree of divorce from her. Robin had previously been married to Franklin Luke Singer, which marriage ended in divorce in 1967 or 1968. Robin left the defendant in November of 1969 and went to California to be with Singer. She returned to Casper in late January or early February of 1970. Singer came to Casper about the end of February and he lived with Robin part of the time and his parents part of the time. Before Singer came to Casper Robin advised the defendant that she was going to remarry Singer.

The evening of March 21, 1970, defendant attended a birthday party for his brother which ended around 8:30 p. m. Later the same evening, about 11 p. m., defendant, his brother, sister-in-law, and a female cousin went to a dance at Glenrock, returning to Casper about 2 a. m., March 22, 1970. Defendant and his cousin then went to a private club in Casper, remaining there until about 4 a. m. After taking his cousin home defendant returned to the ranch home of his brother for the purpose of having some breakfast. When defendant's sister-in-law refused to get up and prepare breakfast, he decided to go to the home of Robin Bentley in Casper for breakfast.

Upon arrival at Robin's home defendant parked his car in the alley behind the house, took a .22 caliber pistol from the car and placed it in the pocket of his jacket because, as he testified, he couldn't lock the car and didn't want the gun stolen. He went to the back door and knocked. The door was opened and he walked into the house where he was confronted by Singer. There was some discussion be-

John E. Ackerman, Casper, for appellant.

Clarence A. Brimmer, Atty. Gen., Frederic C. Reed, Special Asst. Atty. Gen., Cheyenne, John Burk, County Atty., Casper, for appellee.

Before McINTYRE, C. J., and PARKER, McEWAN, and GUTHRIE, JJ.

Mr. Justice McEWAN delivered the opinion of the court.

John Bentley, defendant, was charged with the crime of first degree murder of

tween the defendant and Singer, followed by a struggle and wrestling. According to the defendant, the pistol fell out of his pocket and hit the top of the stove. Both men grabbed for the gun and were struggling for its possession. They struggled from the kitchen into the living room where the gun was discharged twice. Defendant, following the second shot, gained possession of the gun and left the house by the front door.

Defendant then drove from the scene to an area near the Fairgrounds in Casper where he placed the gun in a wrecked car, and then went to his home where he was arrested the morning of March 22, 1970.

The defendant contended the trial court committed reversible error in the following specified areas:

1. The trial court unlawfully and illegally restricted and limited the defendant's attorney in his cross-examination of the State's chief investigator, Casper Chief of Police Con Delgarno;

2. The court erred in giving an instruction defining reasonable doubt and presumption of innocence;

3. The court erred in refusing to give defendant's requested instructions relating to testimony as to the defendant's good character and the inferences to be drawn therefrom;

4. The court should have granted defendant's motion for acquittal, or, in the alternative, a new trial, because the verdict was contrary to the weight of evidence and was not supported by sufficient and substantial evidence; and

5. The trial court abused its discretion in the sentence imposed upon the defendant.

*Limitation of Cross-Examination*

Shortly after the decedent was shot, defendant was arrested and taken to the police station where he was questioned by Casper Chief of Police Delgarno. The questions and answers were taken on a tape recorder and later transcribed. By stipulation the tape was played to the jury and the transcript was admitted without objection. No question was raised as to the voluntariness of the statements. During the questioning of the defendant, Chief Delgarno commented "* * * I do know the son of a bitch [deceased] deserved killing many, many times for things he's done in the years past." During the trial and upon direct examination Chief Delgarno was asked if he meant what he had said about the decedent and he responded without objection that he had not but that he had only made such comments because he thought it would induce the defendant to talk more freely. Prior to the commencement of the trial the State had presented a motion in limine to the trial court. In response to that motion the trial court ruled that the character of the decedent would be relevant only as to the decedent's quarrelsome nature or disposition to violence and then only if the issue of self-defense was raised.

The defendant asked Chief Delgarno if he had any basis for his answer on direct examination, to which he replied: "I don't know either way, sir." It then became clear that Chief Delgarno knew nothing of the reputation of deceased, and this testimony did not, as contended by the defendant, tend to show that deceased was "* * * an upright, upstanding good citizen." The defendant argued that he was severely limited by the trial court in his cross-examination of Chief Delgarno as to the character of the decedent, which cross-examination was for the purpose of impeachment. We find no testimony by Chief Delgarno which touches upon the quarrelsome nature of decedent. The defendant argued and cited cases relating to due process of law including the defendant's right to be confronted by and cross-examine witnesses against him. We fail to see that this argument is pertinent because the witness, Chief Delgarno, was not, as to this particular point, a witness against the defendant.

The defendant did not contend the trial court was incorrect in its ruling that the

character of the decedent was relevant only for the stated limited purpose and we find no limitation imposed by the trial court on either direct or cross-examination as to that phase of decedent's character. There was no error in the trial court's handling of this portion of the trial.

### Reasonable Doubt Instruction

Defendant objected to the giving of an instruction attempting to define reasonable doubt on the grounds that it contained " * * * an improper definition of reasonable doubt." The instruction was as follows:

"THE COURT INSTRUCTS THE JURY that a reasonable doubt is such a doubt as exists in the mind of a reasonable man after a full, free and careful examination and comparison of all the evidence. It must be such a doubt as would cause a careful considered and prudent man to pause and consider before acting in the grave and most important affairs of life."

■ The sufficiency of the defendant's objection is highly questionable because it was not pointed out to the trial court wherein the definition was improper.[1] Nonetheless, we have spoken on several occasions as to the wisdom of giving an instruction attempting to define reasonable doubt, and it appears a positive pronouncement is in order.

As early as 1913 in Claussen v. State, 21 Wyo. 505, 133 P. 1055 at 1056, this court held that " * * * there is no definition of 'reasonable doubt' which would convey to a juror's mind any clearer idea than the term itself." This court again addressed itself to this question in State v. Eldredge, 45 Wyo. 488, 21 P.2d 545 at 547, in 1933, and in quoting from R.C.L. said:

" * * * the text further quite sensibly remarks: 'And so it is asserted by excellent authority that courts instructing juries in criminal cases should make no attempt to define the expression but should merely * * * let the words themselves carry their own definition.' "

Reference was also made to the remarks of Chief Justice Scott in the 1913 *Claussen* case.

Again, in 1945, in State v. Goettina, 61 Wyo. 420, 158 P.2d 865 at 882, this court said that as a general rule reasonable doubt need not be defined in instructions. In State v. Velsir, 61 Wyo. 476, 159 P.2d 371 at 378, 161 A.L.R. 220, in 1945, it was pointed out that it was not error to refuse to give an instruction attempting to define reasonable doubt and mention was made of the *Eldredge* and *Claussen* cases. A recent Oklahoma decision, Wilson v. State, Okl.Cr., 403 P.2d 262 at 264, held it was error for the trial court to give an instruction which attempted to define "reasonable doubt." That case cited 23A C.J.S. Criminal Law § 1268, p. 658, which said:

"It has been held that the phrase 'reasonable doubt' is self explanatory, that definitions thereof do not clarify its meaning but rather tend to confuse the jury, and that therefore instructions defining it are unnecessary and should not be given, particularly when no specific request is made therefor."

9 Wigmore, Evidence, § 2497, p. 316, 318–320 (3rd Ed. 1940) makes this comment:

"Many others, [instructions defining reasonable doubt] in varying forms, convey the same notion in more or less well-chosen words; and each Court has its stores of precedents of instructions approved and disapproved. Nevertheless, when

1. Rule 51, W.R.C.P., which is made applicable to criminal proceedings by Rule 31, W.R.Cr.P., provides in part: " * * * No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. * * *" This provision is identical to the text of Rule 51 of the Fed.Rules of Civ.Proc. The object of the Rule is to offer the trial judge an opportunity upon second thought to correct an erroneous charge or failure to instruct.

anything more than a simple caution and a brief definition is given, the matter tends to become one of mere words, and the actual effect upon the jury, instead of being enlightenment, is likely to be rather confusion, or, at the least, a continued incomprehension. In practice, these detailed amplifications of the doctrine have usually degenerated into a mere tool for counsel who desire to entrap an unwary judge into forgetfulness of some obscure precedent, or to save a cause for a new trial by quibbling, on appeal, over the verbal propriety of a form of words uttered or declined to be uttered by the judge. The effort to perpetuate and develop these elaborate unserviceable definitions is a useless one, and serves to-day chiefly to aid the purposes of the tactician. It should be abandoned."

■ The instruction attempting to define reasonable doubt is questioned frequently,[2] and this court, as well as other appellate courts, is called upon to determine if a definition is correct. We said as early as 1913 that it is not error to refuse to give a definition instruction, and as late as 1971 (*Alcala* case) that trial courts would be well advised to avoid such an instruction. The phrase "reasonable doubt" is self-explanatory and definitions do not clarify its meaning but rather tend to confuse a jury. Instructions defining it are unnecessary and should not be given.

### Presumption of Innocence Instruction

The trial court over objection of the defendant gave the following instruction:

"The rule which clothes every person accused of crime with the presumption of innocence, and imposes upon the State the burden of establishing his guilt beyond a reasonable doubt, is not intended to aid anyone who is in fact guilty be-

yond a reasonable doubt to escape, but is a humane provision of the law, intended insofar as human agencies can, to guard against the danger of any innocent person being unjustly punished. To establish the guilt of a defendant beyond a reasonable doubt does not require that such guilt shall be established to an absolute certainty. Absolute certainty in the establishment of any fact is rarely attainable, and never required in courts of justice."

■ We discussed this instruction in June of 1970 in Kennedy v. State, Wyo., 470 P.2d 372, 375–377, reh. den. 474 P.2d 127, cert. den. 401 U.S. 939, 91 S.Ct. 933, 28 L.Ed.2d 218, and again in September of 1970 in Carrillo v. State, Wyo., 474 P.2d 123, 125–126, cert. den. 401 U.S. 921, 91 S. Ct. 907, 27 L.Ed.2d 823. The question again arose in Lofton v. State, Wyo., 489 P.2d 1169, handed down in October of 1971, which was after the case at hand was tried. In the *Lofton* case we said at page 1174:

" * * * in order to avoid future contentions of impropriety, it is respectfully suggested to the trial courts that the probable difficulties, which will be caught up and proliferated in future cases, outweigh any benefit accruing from the instruction. To that end it might well be avoided."

That portion of this instruction reading " * * * is not intended to aid anyone who is in fact guilty beyond a reasonable doubt to escape, but is a humane provision of the law, * * * " should not be given in the future. Also, that portion of this instruction, or any other instruction attempting to define reasonable doubt, should not be given for the reasons set forth in the above discussion on the reasonable doubt instruction.

2. Lonquest v. State, Wyo., 495 P.2d 575, 583; Simms v. State, Wyo., 492 P.2d 516; Alcala v. State, Wyo., 487 P.2d 448, 460, reh. den. 487 P.2d 467, cert. den. 405 U.S. 997, 92 S.Ct. 1259, 31 L.Ed.2d 466, reh. den. 406 U.S. 911, 92 S.Ct. 1613, 31 L.Ed.2d 823.

### Trial Court's Refusal to Give Instructions as to Defendant's Good Character

The defendant cited as authority for giving of the two offered instructions Am.Jur. Trials, Am.Jur.2d and a 1954 California case. We are unable to find reference to the offered instructions in any of the citations. The citations have to do with the introduction of evidence as to the good reputation and character of one charged with a crime and not with instructions.

It is also noted that defendant made no citation to the record where objections were made to the trial court's refusal to give the requested instructions which set forth his reasons and grounds why the requested instructions should be given. We have examined the record and find no discussion as to the offered instructions. Under Rule 51, the defendant may not assign as error failure to give such instructions where he failed to point out to the trial court his reasons therefor. There was no fundamental error in the trial court's failure to give the requested instructions.

In his brief defendant contended that the trial court "refused to give any from [sic] of Instruction regarding the good character of the Defendant," but an examination of the record revealed this is not true. The trial court, without objection from either the State or the defendant, instructed the jury:

> "The defendant has introduced evidence of his good reputation in his community for peacefulness, good order, non-violence and truthfulness. You are instructed that evidence of good reputation may be considered with all the other evidence in the case in determining whether the prosecution has proved the defendant's guilt beyond a reasonable doubt."

There was, accordingly, no error in this regard.

### Verdict Not Supported by the Evidence

The defendant argued " * * * that the verdict of the jury was contrary to the weight of the evidence when viewed in its totality and was not supported by sufficient evidence." Defendant in his argument failed to consider that an appellate court must view the evidence in the light most favorable to the state. Harris v. State, Wyo., 487 P.2d 800. He set forth his interpretation of what the evidence showed, but as we said in the *Harris* case, an appeal to the Supreme Court is not a new trial wherein this court sits as a second jury.

When we consider the evidence in light of these pronouncements it is very clear that there was sufficient evidence to support the verdict. Such evidence, which the jury could have believed and apparently did believe, clearly showed a pattern of conduct by the defendant which would establish his guilt beyond a reasonable doubt. The brother of the defendant testified there had been "bad blood" between the defendant and the deceased for several years. The defendant told at least six people that he hated the deceased and he would kill him. He knew the deceased was at the home of Robin Bentley, and before going into the house the defendant placed a .22 pistol in his pocket, with which pistol the deceased was killed. The defendant was admitted to the house by the deceased after which two shots were fired, one of which killed decedent. Robin Bentley then came into the room where the defendant and decedent were, the defendant struck her several times and then ran from the house taking the gun with him. He drove to an area near the Fairgrounds where he placed the gun in a wrecked automobile. The defendant admitted the shooting but defended his action on the theory of self-defense or that the gun went off accidentally during the struggle between him and deceased. The defendant himself testified he had told one person that if he and the deceased ever got into a fight one of them would probably end up dead.

This evidence was clearly sufficient to support the jury's verdict of manslaughter, and was probably even sufficient to have supported a verdict for murder.

*Sentencing of the Defendant*

The defendant argued that the trial court abused its discretion in imposing a sentence of from 5 to 15 years in the Wyoming State Penitentiary. He was found guilty by the jury of the crime of manslaughter (§ 6–58, W.S.1957) for which he could be " * * * imprisoned in the penitentiary not more than twenty years." Defendant made no valid argument nor cited any authority for his contention that the trial court abused its discretion in the sentence imposed. The only argument made by defendant was that the trial court in passing sentence remarked that defendant knew the deceased was in the house of Robin Bentley when he entered, but that the evidence does not support this conclusion. Although the defendant testified he did not know the decedent was present, there was ample evidence from which the trial court could have concluded the defendant knew the deceased was in the house. In any event, the sentence was within the limits as set by the legislature, and since the determination of the penalty is exclusively within the discretion of the trial court it must stand. The defendant showed no abuse of discretion and we find none.

The defendant concluded his argument by asking this court to consider the five assignments of error not as five individual assignments but as a group, and, when thus considered, the totality of the errors constituted grounds for reversal. Since we find no error in any of the five areas this argument has no merit.

Affirmed.

McINTYRE, Chief Justice (concurring).

I write this special concurrence simply because I do not want to be understood as trying to tell the trial judges how to do their jobs. More than once we have said the instruction on presumption of innocence which was used in this case could not be disapproved.

Although I agree there is language in the instruction which probably could be left out without causing any handicap to the prosecution, nevertheless a trial judge in any given case should decide what is advisable with respect to instructions, as long as the instructions are legally correct and not prejudicial.

Therefore, I do not subscribe to the statement that certain language in the presumption of innocence instruction should not be given in the future. In other respects I concur in the opinion of Justice McEWAN.